UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                                :
TABERNA CAPITAL MANAGEMENT,                                     :
LLC, and LARRY LATTIG, Litigation Trustee for                   :
the First Magnus Litigation Trust, as Successor in              :
Interest herein to Taberna Capital Management,                  :
LLC and The Bank of New York Mellon Trust                       :
Company, N.A., in its Capacity as Trustee Under                 :
The Indenture and Property Trustee for the                      :
First Magnus TPS Trust                                          :   Civil Action No.
                                                                :   08 Civ. 11355 (DLC)
                              Plaintiff,                        :
                                                                :
      - against -                                               :
                                                                :   **DECLARATION OF**
GURPREET S. JAGGI,                                              :   **GURPREET S. JAGGI**
                                                                :
                              Defendant.                        :
----------------------------------------------------------------x

    I, Gurpreet S. Jaggi, pursuant to 28 USC § 1746, declare as follows under penalty of perjury:

    1.    In July 2006, I was the CEO of First Magnus Capital, Inc. ("FMCI") and CEO of First Magnus Financial Corporation ("FMFC"). FMCI had only recently become operational as a holding company at this time. FMFC was its principal operating subsidiary, and had operated as a mortgage lending company since 1996.

    2.    As of July 2006, FMFC had over 5,000 employees and operated nationwide through approximately 300 branch offices, and was issuing approximately $25 billion in loans annually. It employed approximately 16 persons in its accounting department supervised by FMFC's Controller and Chief Financial Officer. FMFC also employed approximately nine in-house lawyers, and approximately 7 additional legal support and regulatory compliance employees, overseen by FMFC's General Counsel.

1

3.  I have no relationship with any Taberna entity and have had no dealings with them other than the TPS Transaction.

4.  I relied upon FMFC's legal and accounting staff, outside counsel, and company auditors, to provide me with information concerning the financial status and regulatory affairs of the company. I relied upon the same employees, and auditors to determine and accurately provide the financial and regulatory information requested in the Questionnaire Response, and believed them to be competent and reliable for such tasks.

5.  I believed the Questionnaire Response and documents submitted with it to be truthful and accurate. I did not know of any reason why Taberna and its counsel should not rely upon such information, and did not have knowledge of false statements or material omissions in such information.

6.  I did not have any discussions with Taberna personnel regarding the Questionnaire Response or topics addressed therein. I did not participate in the due diligence process beyond signing the Questionnaire Response for FMCI.

7.  HUD, OIG, and other regulatory audits were routine and continually ongoing at FMFC. Such audits were the responsibility of and handled by personnel in FMFC's legal, compliance, and risk management departments.

8.  Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment[1] Exhibits LL and MM contain true and correct copies of the OIG Reports, dated July 14, 2008 and August 1, 2008, which were posted on the internet. To my knowledge, these were the first

---

1 Further references to Exhibits are references to the exhibits to the appendix.

2

OIG audit reports with RESPA findings, and were issued after FMFC and FMCI had filed bankruptcy and ceased operations, and without the benefit of a company response and rebuttal. Exhibit NN contains true and correct copies of the letters from HUD to me, dated February 24, 2009, reflecting their determinations in response to the OIG reports.

9. Prior to receipt of the August 2, 2006 DFI action, I had no knowledge of the any non-routine audits or adverse findings by DFI.

10. I understand that the company's legal personnel advised counsel for Taberna of the DFI action. I did not participate in any discussions or decisions regarding this disclosure, which was handled entirely by FMCI's legal personnel.

11. The DFI action was fully resolved between DFI and FMFC by settlement within 4 months, without admission of wrongdoing, and a reduced fine of $200,000.00. Neither the DFI order nor the settlement interrupted FMFC's operations and had no material impact on its finances. Exhibit AA is a true and correct copy of the letter, notice and order issued to FMFC on August 2, 2006. Exhibit CC is a true and correct copy of the December 1, 2006 Consent Order resolving the matter.

12. FMFC's accounting department and its Controller had responsibility for preparing the company's financial statements in accordance with Generally Accepted Accounting Principles (GAAP), and prepared such statements with input, review, and advice from their outside auditors and accountants.

13. I believed the company's financial officers and accounting staff, and outside auditors to be competent and reliable; relied on them to establish and follow proper accounting

procedures; and relied upon the financial statements prepared by them, including the May 31, 2006 financial statement.

14.     I had no knowledge that FMFC's May 31, 2006 financial statements, or the net equity amount stated therein and included in the Questionnaire Response, were incorrect, or violated GAAP in any respect. To my knowledge, the May 31, 2006 interim financial statements and all other financial statements provided to Taberna by FMCI were properly prepared, using the same accounting procedures and practices utilized in the ordinary course throughout the company's existence and reviewed by its outside auditors.

15.     I did not participate in calculation of reserves, revenue, or asset valuation at any time prior to the TPS Transaction closing, and understood that such calculations were prepared by the CFO, Controller, and their staff, with input from the company's outside auditors.

16.     FMCI's default on its obligations arising from the TPS Transaction resulted from the collapse of FMFC, and FMFC's and FMCI's subsequent bankruptcies. To my knowledge, HUD has never revoked or initiated proceedings to revoke any license or authorization of FMFC or FMCI, and has taken no action that interfered with FMFC's or FMCI's business operations or contributed in any fashion to the entities' bankruptcies or FMCI's default on its obligations relating to the TPS Transaction.

17.     Exhibits O, P, Q, and KK are true and correct copies of the Purchase Agreement, Trust Agreement, Indenture Agreement, and Junior Subordinated Note, respectively, from the TPS Transaction.

18.     Exhibit S contains true and correct copies of the Trust Preferred Securities Certificates issued at the closing of the TPS Transaction.

19. Exhibit L is a true and correct copy of an e-mail I received on or about August 17, 2006 from Eric Van Nispen.

20. Exhibit N is a true and correct copy of an e-mail train I received on or about August 22, 2006 from Eric Van Nispen and Tom Bogal.

21. Exhibit Y is a true and correct copy of the OIG draft audit report issued to FMFC on or about November 9, 2006. Exhibit Z contains a true and correct copy of the letter issued by HUD to FMFC with HUD's resolution of the matter.

Executed in Tucson, Arizona on October 22, 2010.

_____
Gurpreet S. Jaggi