UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
TABERNA CAPITAL MANAGEMENT, : No. 08 Civ. 11355 (DLC)
LLC, and LARRY LATTIG, Litigation Trustee for :
the First Magnus Litigation Trust, as Successor in :
Interest herein to Taberna Capital Management, :
LLC and The Bank of New York Mellon Trust :
Company, N.A., in its Capacity as Trustee Under : **DEFENDANT'S RULE 56.1**
The Indenture and Property Trustee for the : **STATEMENT OF UNDISPUTED**
First Magnus TPS Trust : **MATERIAL FACTS**
:
                              Plaintiff, :
:
   - against - :
:
GURPREET S. JAGGI, :
:
                              Defendant. :
------------------------------------------------------------x

Defendant, Gurpreet Jaggi ("Jaggi") by his attorneys, Kane Kessler P.C., pursuant to Rule 56.1 of the Local Civil Rules for the Southern District of New York, submits the following as his Statement of Material Undisputed Facts and contends that there are no genuine issues to be tried with respect to the following facts:

## Background of the Action

1. Plaintiffs' claims in this action are based upon a July 17, 2006 due diligence questionnaire response submitted by First Magnus Capital, Inc. ("FMCI") to Taberna Capital Management LLC ("Taberna Capital" or "Taberna") in connection with a financing transaction, which Plaintiffs characterize as a "loan transaction involving Taberna and FMCI," that closed in August 2006. First Amended Complaint at ¶6, Ex. OO to Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment ("Appendix").

2. The financing transaction was structured using the issuance of trust preferred securities to fund the loan, and is referred to in Plaintiff's complaint, and here, as the "TPS

Transaction." The FMFC Litigation Trustee is asserting claims on behalf of Taberna Capital and the Bank of New York Mellon Trust Company, N.A. pursuant to an Assignment of Claims, dated September 16, 2009. First Amended Complaint at ¶19 (Appendix Ex. OO).

### Taberna and its Role in the TPS Transaction

3. Taberna Securities, LLC ("Taberna Securities") originated and performed the due diligence for the TPS Transaction. March 2, 2010 Deposition of Jack Salmon ("Salmon I Depo."), at 37-38, 40-41, 72-74 (Appendix Ex. A).

4. Taberna Securities received a placement fee of $500,000.00 from the closing proceeds, which was contingent upon the transaction closing and was split with another broker. Salmon I Depo. at 42 (Appendix Ex. A ); June 29, 2010 Deposition of Jack Salmon ("Salmon II Depo.") at 46 (Appendix Ex. B).

5. Taberna Capital managed the collateral after the transaction funded, and syndicated and securitized the TPS Transaction together with similar unrelated financing transactions as collateralized debt obligations ("CDOs") issued by off-shore trusts created by Taberna. Salmon I Depo. at 29-32, 40-41, 45 (Appendix Ex. A); Salmon II Depo. at 72-74 (Appendix Ex. B). Taberna Capital is paid a periodic management fee so long as the credit facility performs. Salmon I Depo. at 40-41 (Appendix Ex. A).

6. Taberna Capital and Taberna Securities are wholly owned subsidiaries of Taberna Realty Finance Trust ("Taberna Realty"), a Maryland Real Estate Investment Trust. Salmon I Depo. at 33 (Appendix Ex. A).

7. In 2006, Taberna Realty merged with RAIT Financial Trust ("RAIT"), a Maryland Real Estate Investment Trust publicly traded on the NYSE. As of year-end 2006, RAIT and Taberna Realty reported combined assets in excess of $12.1 billion, and an investment

portfolio in excess of $11 billion. Plaintiffs' Response to Request to Admit ("RFA Response"), No. 4. (Appendix Ex. C); RAIT 2006 10-K, at p.57. (Appendix Ex. D).

8. Taberna created the TPS financing product and was the first company to use it in the industry. Salmon I Depo. at 80 (Appendix Ex. A).

9. The Taberna personnel involved in the FMCI due diligence included: Thomas Bogal, an attorney who served as Chief Operating Officer of Taberna Securities, Mitchell Kahn, an attorney who served as President of Taberna Capital, Wade Vandergrift, an attorney who served as Vice President and Analyst for Taberna Capital and Alvar Soosaar, a credit underwriter. *See* RAIT 2006 10-K (Appendix Ex. D); Deposition of Thomas Bogal ("Bogal Depo.") at 9 (Appendix Ex. E); Deposition of Mitchell Kahn ("Kahn Depo."), at 13 (Appendix Ex. F); Deposition of Wade Vandergrift ("Vandergrift Depo."), at 12 (Appendix Ex. G,); Salmon I Depo. at 66 (Appendix Ex. A,).

10. Taberna's investment/credit committee that reviewed and approved the transaction consisted of: Jack Salmon, Taberna's CFO and a certified public accountant; Daniel Cohen, an entrepreneur and investor in commercial real estate assets; Scott Schaeffer, the President of RAIT Financial trust who had many years of experience in commercial lending; and Andy Kaufman, who had experience in commercial real estate services. Vandergrift Depo. at 46-47 (Appendix Ex. G).

11. Taberna representatives who performed due diligence on behalf of the company were trained to obtain all of the information relevant to a determination as to whether or not a loan should be approved and had expertise in reading and understanding financial statements and evaluating general economic conditions. Vandergrift Depo. at 48-49 (Appendix Ex. G*)*; Salmon I Depo. at 78-79 (Appendix Ex. A).

12. Jack Salmon worked in the audit division of Arthur Anderson for 27 years, audited loan reserves and valuations of loan related assets, and considered himself an expert in GAAP accounting. Salmon II Depo. at 11, 14 (Appendix Ex. B).

### Taberna's Due Diligence Questionnaire

13. FMCI executed a letter of intent with Taberna Securities on June 30, 2006 to accept TPS financing of $60 million. Vandergrift Depo. ( Appendix Ex. G).; 6/30/06 Letter of Intent (Appendix Ex. H).

14. Thereafter, Taberna provided a document request and a "Taberna Trust Preferred Securities Due Diligence Questionnaire" to FMCI. Declaration of Matthew Thrasher ("Thrasher Decl.") at ¶ 2.

15. On July 17, 2006, FCMI's counsel Matthew Thrasher returned FMCI's completed response to the questionnaire to Thomas Bogal, Taberna Securities' legal counsel (the "Questionnaire Response"). 7/17/06 Letter from Thrasher to Bogal with Questionnaire Response (Appendix Ex. I)

16. Mr. Thrasher completed the Questionnaire Response with input from several knowledgeable personnel at FMCI and First Magnus Financial Corporation ("FMFC"), a wholly-owned mortgage banking subsidiary of FMCI. Thrasher Decl. at ¶4; Bogal Depo. at 32 (Appendix Ex. E).

17. One of Mr. Bogal's duties at Taberna was to review all of the questionnaires that were submitted on behalf of potential borrowers. *Vandergrift Depo. at 58 (Appendix Ex. G)*.

18. The Questionnaire Response contains a signature block for First Magnus Capital, Inc., which was executed by Defendant Jaggi in his capacity of "Chief Executive Officer" of the corporation, and states, in pertinent part, the following:

4

> *The Company represents*, and the undersigned represents that *to the best of his or her knowledge*, that the answers to the questions contained herein are correct and complete as of the date set forth below …. *The Company agrees* to notify Taberna and its counsel immediately of any changes that should be made in the foregoing answers as a result of any developments that may occur. *The Company acknowledges* that Taberna and its counsel will be relying on the answers herein as part of their due diligence investigation. The undersigned certifies that he or she has fully and diligently investigated all of the responses herein, or to the extent such matters fall outside of the undersigned's responsibility, he or she has made full and diligent inquiries of the appropriate individuals responsible for such matters, and that he or she knows of no reason why Taberna and such counsel should not rely thereon. (Emphasis added.)

*See* 7/17/06 Letter from Thrasher to Bogal with Questionnaire Response (Appendix Ex. I)

19. Also on July 17, 2006, Mr. Thrasher provided Mr. Bogal with documents in FMCI's response to Taberna's document request, which had been itemized in Exhibits to the Questionnaire Response and included, among other things, FMFC's annual financial statements from 2003 through 2005 audited by Grant Thornton, FMFC's interim balance sheet and statement of operations as of May 31, 2006, three final Office of Inspector General ("OIG") audit reports, a draft OIG audit report dated "June XX, 2006," and FMFC's response to the draft audit report. Thrasher Decl. at ¶5; *see also* Produced Financials and Draft Audit Report (Appendix Exs. HH and Y).

20. Taberna representatives believed reviewing all of the books and records provided by a potential borrower in this type of transaction was critical in determining whether to make a loan. Vandergrift Depo. at 50 (Appendix Ex. G).

21. In addition to the documents requested and provided, all of FCMI's and FMFC's personnel and records were available for interview, inspection, review and copying throughout the due diligence period. No requests for information or access to records or employees were refused. Thrasher Decl. at ¶6; Salmon I Depo. at 177 (Appendix Ex. A).

5

## The TPS Transaction Closing and Operative Contracts

22. On or about August 15, 2006, FMCI decided to terminate the transaction and cancel the letter of intent. Thrasher Decl. at ¶ 10; Lemke Depo. at 95 (Appendix Ex. J); 8/15/06 email from Lemke to Thrasher (Appendix Ex. K)

23. In response, Taberna proposed that FMCI proceed with a smaller transaction at $25 million, and offered more attractive terms for the same if FMCI would promptly close. Lemke Depo. at 95 (Appendix Ex. J); 8/17/06 email from Erik Van Nispen to Gary Malis and Jaggi (Appendix Ex. L ); 8/18/06 Bogal/Van Nispen emails (Appendix Ex. M).

24. Following an exchange of emails regarding the new deal terms, FMCI agreed to proceed, and the transaction proceeded to closing with the renegotiated terms and reduced amount Bogal Depo. at 100-02; 105-106 (Appendix Ex. E); 8/22/06 Bogal/Van Nispen email (Appendix Ex. N). Lawyers for Taberna, FMCI and the parties to the transaction (identified below) then prepared the formal contracts and closing documents for the financing at the reduced amount. The transaction closed and funded on August 30, 2006.

25. The TPS Transaction operative documents include: (i) a Purchase Agreement among FMCI and First Magnus TPS Trust (the "Trust") as the Sellers, and Merrill Lynch International as the Purchaser of 25,000 Preferred Securities from the Trust (defined below) for $25,000,000; (ii) an Amended and Restated Trust Agreement among FMCI as the Depositor, JPMorgan Chase Bank as the Property Trustee, Chase Bank USA as the Delaware Trustee, and the Administrative Trustees named in the Trust Agreement (authorizing the Trust to sell Common Securities and Preferred Securities and to hold title to the Notes issued pursuant to the Indenture); and (iii) a Junior Subordinated Indenture between FMCI and JPMorgan Chase Bank as the Trustee of the Trust. Purchase Agreement (Appendix Ex. O); Trust Agreement (Appendix

Ex. P); Indenture (Appendix Ex. Q).

26. The Purchase Agreement specifies "each certificate signed by any trustee or the Trust or any officer of the Company…in connection with the Operative Documents and the transactions contemplated hereby and thereby shall be deemed to a representation and warranty of the Trust and/or the Company, as the case may be, and not by such trustee or officer in any individual capacity." Appendix Ex. O, Purchase Agreement at ¶ 3(h).

27. Neither Taberna Capital nor Taberna Securities (or any other Taberna affiliate) is a party to the TPS Transaction operative documents. Purchase Agreement (Appendix Ex. O); Trust Agreement (Appendix Ex. P); Indenture (Appendix Ex. Q).

28. A Junior Subordinated Note in the amount of $25,511,000 (the "Note") was issued pursuant to the Junior Subordinated Indenture, under which FMCI is the maker and JPMorgan Chase Bank is the holder in its capacity as the Property Trustee of the Trust. *See* Appendix Ex. KK. Bank of New York Mellon Trust ("BONY") is the successor Property Trustee, making BONY the current holder of the Note. *See* Indenture (Appendix Ex. Q); Declaration of Raphael Licht (Appendix Ex. R).

29. Neither Taberna Preferred Funding VIII nor Taberna Capital is the holder of the Junior Subordinated Note. *See* Appendix Ex. KK.

30. In connection with the TPS Transaction, Common Securities in the amount of $511,000 were issued to FMCI and Preferred Securities in the amount of $25,000,000 were issued to Cede & Co. *See* Trust Preferred Securities Certificates (Appendix Ex. S).

31. Taberna formed Taberna Preferred Funding VIII, Ltd. for the purpose of serving as a CDO transaction entity. Salmon II Depo. at 72-73 (Appendix Ex. B).

32. Taberna Preferred Funding VIII acquired the Preferred Securities issued by the

7

32. Taberna Preferred Funding VIII acquired the Preferred Securities issued by the Trust pursuant to the Indenture and is the beneficial holder of the Preferred Securities. Declaration of Raphael Licht ("Licht Decl.") ¶3 (Appendix Ex. R); Salmon Depo. II at 72 (Appendix Ex. B).

### Defendant Jaggi

33. Jaggi has no relationship with any Taberna entity and has had no dealings with them other than with respect to the TPS Transaction. Declaration of Gurpreet Jaggi ("Jaggi Decl.") at ¶ 3.

34. In July 2006, Jaggi served as CEO of FMCI and CEO of FMFC. Jaggi Decl. at ¶ 2.

35. FMFC operated nationwide through approximately 300 branch offices, having over 5,000 employees, and was issuing approximately $25 billion in loans annually. It employed approximately 16 persons in its accounting department supervised by FMFC's Controller and Chief Financial Officer. FMFC also employed 9 in-house lawyers, and approximately 7 legal support and regulatory compliance employees, overseen by FMFC's General Counsel. Jaggi Decl. at ¶ 2; *see also* Deposition of Jasjit Chopra ("Chopra Depo.") at 12 (Appendix Ex. T).

36. Jaggi did not draft the answers to the Questionnaire Response. Rather, FMFC's General Counsel, Doug Lemke, undertook responsibility for the Questionnaire Response, and utilized staff attorney Matt Thrasher to locate and compile the information and documents requested in the questionnaire and document request from the employees responsible for and knowledgeable about the individual inquiries. Lemke Depo at 102, 178-179; 244 (Appendix Ex. J); *see also* Deposition of Gurpreet Jaggi ("Jaggi Depo.") at 178 (Appendix Ex. U) ("the

8

questionnaire was filled out by the legal team").

37. HUD, OIG, and other regulatory audits were routine and continually ongoing at FMFC. Such audits were not within Jaggi's area of responsibility at FCMI or FMFC; rather they were in the responsibility of and handled by personnel in FMFC's legal department. Jaggi Decl. at ¶ 7.

38. In the ordinary course of FMFC's affairs, Jaggi relied upon his legal and accounting staff, outside counsel, and company auditors, to provide him with information concerning the financial status and regulatory affairs of the company. He relied upon the same employees, and auditors to determine and accurately provide the financial and regulatory information requested in the Questionnaire Response, and believed them to be competent and reliable for such tasks. Lemke Depo. at 158-159 and 251-252 (Appendix Ex. J); Jaggi Decl. at ¶ 4.

39. Jaggi believed the Questionnaire Response and documents submitted with it to be truthful and accurate; did not know of any reason why Taberna and its counsel should not rely upon such information; and did not have knowledge of false statements or material omissions in such information. Jaggi Decl. at ¶ 5.

40. Jaggi did not have any discussions with Taberna personnel regarding the Questionnaire Response or topics addressed therein. He did not participate in the due diligence process beyond signing the Questionnaire Response for FMCI. Jaggi Decl. at ¶ 6.

### Taberna's Knowledge Regarding Plaintiffs' Alleged Nondisclosures

41. Taberna's initial complaint alleged that the Questionnaire Response failed to disclose an OIG investigation of RESPA violations. *See* Complaint at ¶¶ 23-26 (Appendix Ex. PP).

42.     The Amended Complaint filed by the Litigation Trustee's counsel added allegations that the Questionnaire Response (i) misrepresented the company's net equity; (ii) failed to disclose an OIG interview regarding branch manager agreements; and (iii) concealed a secret intent to use the loan proceeds to fund a stock redemption and FMFC operations, rather than to form a federal savings bank. First Amended Complaint at ¶¶ 31-81 (Appendix Ex. OO).[1]

### *RESPA Audit*

43.     The investigation by the OIG of RESPA issues was disclosed to Taberna by FMCI. One of the documents produced to Taberna's legal counsel Tom Bogal on July 17, 2006, and itemized in the Questionnaire Response under "Item 2(c)—Pending Regulatory Investigations," was a "Draft Audit Report – First Magnus Financial Corporation." That report stated during OIG's October 2005 –May 2006 audit work:

> [W]e identified information indicating Real Estate Settlement Procedures Act violations by First Magnus involving the payment of quality incentives, also known as volume-based incentives, to brokers for originating and processing federally related mortgage loans. The results will be addressed in a later report.

"Item 2(c)," "June XX, 2006" OIG Draft Report at p.10. (Appendix Ex. V).

44.     Neither Bogal nor anyone else at Taberna requested any further information regarding this or any of the other OIG audit reports listed in the Questionnaire response and provided to Taberna. Thrasher Decl. at ¶ 6.

45.     Mitchell Kahn, Co-President of RAIT Financial Trust, the parent company of Taberna Capital, testified that Taberna believed that "[i]nvestigations of companies are not

---

[1] Subsequently, the Litigation Trustee's counsel has added more allegations in his depositions and arguments, namely that Defendant failed to disclose to Taberna a regulatory proceeding filed by the Arizona Department of Financial Institutions ("DFI"), and a suspension of an OTS application for a federal bank charter. Defendant does not concede that Plaintiffs are entitled to these or other de facto amendments or expansion of their claims, and reserves its objections to Plaintiffs raising or submitting evidence of such matters at trial.

10

necessarily indicative of anything but an investigation of a company." Kahn Depo. at 89 (Appendix Ex. F).

46. Nothing in the terms exchanged in the parties' negotiations, or in the formal contracts, conditioned the transaction or funding on Taberna's review of further information or resolution of any regulatory audits or investigations. 8/18/06 Bogal/Van Nispen emails (Appendix Ex. M); 8/22/06 Bogal/Van Nispen emails (Appendix Ex. N); *see also* Purchase Agreement, Indenture, Trust Agreement (Appendix Exs. O, P & Q, respectively).

47. Bogal testified that, if the resolution of any regulatory audits had been a material requirement of the loan transaction, the documents would have reflected the requirement. Bogal Depo. at 98-99 (Appendix Ex. E).

48. OIG's first audit reports with RESPA-related findings were issued in July and August, 2008, after FMFC's bankruptcy. *See* July 14, 2008 Audit Report No 2008-LA-1013 (Appendix Ex. LL) and August 1, 2008 Audit Report No. 2008-LA-1014 (Appendix Ex. MM). HUD's determination regarding such audits, issued in February 2009, leveled no sanctions. *See* February 24, 2009 correspondence re: Audit Reports (Appendix Ex. NN).

49. Taberna hired InSolu, Inc., an outside research and investigation firm, to investigate and report on First Magnus and its executives in connection with the transaction. Deposition of Nona Patronite ("Patronite Depo.") 6-11 (Appendix Ex. W).

50. Taberna never provided InSolu, Inc. with the OIG audit reports, requested any inquiries or investigation regarding OIG or HUD audits, or raised such audits as an item of material concern. Patronite Depo. at 18-20 (Appendix Ex. W).

### *Use of Funds*

51.	The Due Diligence Questionnaire Response stated the "use of proceeds" as "redemption of common stock of the Company." Questionnaire Response (Appendix Ex. I).

52.	Mr. Thrasher provided Mr. Bogal with the anticipated ownership of FMCI "upon completion of the share repurchase" on August 23, 2006. 8/23/06 Thrasher email to Bogal (Appendix Ex. X).

53.	Taberna's credit approval memo and approval meeting minutes reference the impending stock redemption and amount. The Purchase Agreement confirms the stock redemption and stock purchase price. Purchase Agreement at ¶ 4(w) (Appendix Ex. O).

54.	The pre-agreement term sheets, the Purchase Agreement and other closing documents are devoid of any requirement that the loan proceeds be used to form a bank, precluding their use for stock redemptions or working capital for FMFC operations, or otherwise limiting or directing the use of proceeds as conditions of the loan. 8/18/06 Bogal/Van Nispen emails (Appendix Ex. M); 8/22/06 Bogal/Van Nispen emails (Appendix Ex. N); Purchase Agreement, Indenture, Trust Agreement (Appendix Exs O, P & Q, respectively).

55.	If the use of the funds for a particular purpose had been a material requirement of the loan transaction, the requirement would have been reflected in these documents. Bogal Depo. at 98-99 (Appendix Ex. E).

### *OIG Audit of Net Branching.*

56.	OIG's draft audit report addressing branch manager agreements was issued on November 9, 2006, after the TPS Transaction had closed. November 9, 2006 draft audit report (Appendix Ex. Y).

57. An OIG report is not a determination, but simply a recommendation to HUD on whether OIG believes a violation has occurred. Lemke Depo. at 110-113, 119, 121-122, 124, 176, and 249-250 (Appendix Ex. J). FMFC is permitted to respond to the OIG report and recommendations, and HUD then decides whether to accept OIG's recommendations or not. Jaggi Depo. at 226 (Appendix Ex. U).

58. The phone interview memo to file by an FMCI attorney referenced in the Amended Complaint was prepared on July 18, 2006; was not provided to Defendant Jaggi; and contained only such counsel's opinion regarding the purpose of OIG's interview questions, and not determinations by either OIG or HUD. Lemke Depo. at 111-112 and 178-179 (Appendix Ex. J); Jaggi Depo. 223-24 (Appendix Ex. U).

59. OIG's post-closing audit report was disputed by FMCI, and never resulted in any restriction, sanction, or limitation on FMFC's branch manager agreements by HUD. Instead, HUD stated to FMFC's general counsel that it did not agree with OIG's audit conclusions. Lemke Depo at 123-124 (Appendix Ex. J); Jaggi Depo. at 228 (Appendix Ex. U).

60. Ultimately, HUD issued a report on December 12, 2006 that did not completely adopt the OIG recommendations, but instead found that monetary penalties would not be imposed and directed FMFC to modify its net branch employment agreements to eliminate provisions requiring employees to indemnify the FHA approved mortgagee against losses by October 1, 2007. Lemke Depo. at 198-202 (Appendix Ex. J); HUD determination letter, Lemke Depo. Ex. 239 (Appendix Ex. Z).

*DFI Action*

61. On August 2, 2006, after the Questionnaire Response had been submitted, Arizona Department of Financial Institutions ("DFI") issued an Order to Cease and Desist and

Notice of Opportunity for Hearing (the "DFI Order"). The DFI Order stated that it would become final unless a request for hearing was made within 30 days. *See* 8/2/06 DFI letter and order at pp. 1-2 (Appendix Ex. AA).

62. Jaggi had no knowledge of the any non-routine audits or adverse findings by DFI prior to the issuance of the DFI Order. Jaggi Decl. at ¶ 9.

63. FMCI's counsel advised Taberna's counsel of the DFI Order no later than August 11, 2006. Email from Thrasher to Rita Magnusen dated 8/11/06 (Appendix Ex. BB).

64. Taberna's counsel, Rita Magusen of the Kelley, Drye law firm, requested a report on the DFI action, which Mr. Thrasher provided to her later that day, stating "attached please find our memo relating to the Arizona DFI order …please let me know if you have any questions." Email from Thrasher to Rita Magnusen dated 8/11/06 (Appendix Ex. BB); Thrasher Decl. at ¶ 9; *see also* Salmon II Depo. at 29-30, 211 (Appendix Ex. B) (confirming Kelley Drye firm as attorneys for Taberna).

65. Jaggi did not participate in any discussions or decisions regarding this supplemental disclosure, which was handled entirely by FMCI's legal personnel. Jaggi Decl. at ¶ 6.

66. Neither Taberna nor its counsel requested further information regarding the DFI Order. Thrasher Decl. at ¶ 9.

67. Nothing in the terms exchanged in the parties' negotiations, or in the formal contracts, conditioned the transaction or funding on Taberna's receipt and review of further information or resolution of the DFI Order. 8/18/06 Bogal/Van Nispen emails (Appendix Ex. M); 8/22/06 Bogal/Van Nispen emails (Appendix Ex. N); Purchase Agreement, Indenture, Trust Agreement (Appendix Exs. O, P & Q, respectively),

68. If a resolution of the DFI action had been a material requirement of the loan transaction, the requirement would have been reflected in these documents. Bogal Depo. at 98-99 (Appendix Ex. E).

69. Taberna retained a private investigator to perform due diligence regarding FMFC, FMCI and their principals. Taberna never told its investigator about the DFI Order or provided her with Mr. Thrasher's memo regarding the same, or raised it as an area of concern for her investigation. Patronite Depo. at 13-16 & Ex.2. (Appendix Ex. W).

70. Taberna's due diligence team was trained to and would have raised any issues they deemed material to the transaction with the investment committee. Salmon II Depo. at 219 (Appendix Ex. B).

71. In Taberna's credit review meetings and credit reports to the investment committee, which followed FMCI's Questionnaire Response, production of audit reports, and the Thrasher emails and memo regarding the DFI Order, they did not discuss or raise the DFI Order or OIG audits as concerns. Salmon II Depo. at 159-160, 203, 210-11 (Appendix Ex. B).

72. The DFI Order was fully resolved between DFI and FMFC by settlement within 4 months, without admission of wrongdoing, and a reduced fine of $200,000. Neither the DFI Order nor the settlement interrupted FMFC's operations and had no material impact on its finances. Jaggi Decl. at ¶ 11; 12/1/06 Consent Decree (Appendix Ex. CC).

***OTS Application***

73. Emails produced by Taberna reflect Mr. Bogal's and other Taberna employees' knowledge prior to closing that the Office of Thrift Supervision ("OTS") application was "held up" and "in limbo," and that such approval was not needed for the TPS transaction because "they are not yet regulated." See 8/15/06 Bogal/Soosar/Kahn emails (Appendix Ex.DD); Bogal Depo.

at 71-73 (Appendix Ex. E).

74. Nothing in the pre-agreement term sheets, in subsequent negotiations, or in the formal contracts, conditioned funding of the transaction on Taberna's receipt and review of further information on or resolution of the OTS application. 8/18/06 Bogal/Van Nispen emails (Appendix Ex. M); 8/22/06 Bogal/Van Nispen emails (Appendix Ex. N); Purchase Agreement, Indenture, Trust Agreement (Appendix Exs. O, P & Q, respectively).

75. If OTS approval of FMFC's application had been a material requirement for the loan transaction, these documents would have reflected the requirement. Bogal Depo. at 98-99. (Appendix Ex. E).

76. At the time of the credit approval, Taberna knew that the application for regulatory approval relating to a bank was incomplete and uncertain, and requested no contract provisions requiring that it be completed or approved. Salmon II Depo. at 92-95 (Appendix Ex. B).

*Net Equity*

77. The net equity as of May 31, 2006, stated in response to Request No. 4 of the Questionnaire Response, was obtained from and is the same amount stated in FMFC's May 31, 2006 financial statements prepared in the ordinary course by its accounting department. The May 31, 2006 monthly financials, and 2003-2005 audited year end financials, were provided to Taberna by FMCI. Thrasher Decl. at ¶ 4; *see also* Khan/Geogieva/Bogal email dated 8/2/06 and attached financials (Appendix Ex. EE).

78. FMFC's accounting department and its controller had responsibility for preparing the company's financial statements in accordance with Generally Accepted Accounting Principles (GAAP), and prepared such statements with input, review, and advice from their

16

outside auditors and accountants. Jaggi Decl. at 12; Chopra Depo. at 10-12, 16-17, 41-42 (Appendix Ex. T).

79. Jaggi believed the company's financial officers and accounting staff, and outside auditors to be competent and reliable; relied on them to establish and follow proper accounting procedures; and relied upon the financial statements prepared by them, including the May 31, 2006 financial statement. Jaggi Decl. at ¶ 13.

80. Jaggi had no knowledge that FMFC's May 31, 2006 financial statements, or the net equity amount stated therein and included in the Questionnaire Response, were incorrect, or violated GAAP in any respect. Jaggi Decl. at ¶ 14.

81. To Jaggi's knowledge, the May 31, 2006 interim financial statements and all other financial statements provided to Taberna by FMCI were properly prepared, using the same accounting procedures and practices utilized in the ordinary course throughout the company's existence and reviewed by its outside auditors. Jaggi Decl. at ¶ 14.

82. Jaggi did not participate in calculation of reserves, revenue, or asset valuation at any time prior to the TPS Transaction closing, and understood that such calculations were prepared by CFO, controller, and their staff, with input from the company's outside auditors. Jaggi Decl. at ¶ 15.

83. Grant Thornton audited the 2003-2005 year-end financial statements provided to Taberna. *See* produced documents (Appendix Ex. FF); *see also* Chopra Depo. at 16-17, 41-42 (Appendix Ex. T).

84. RAIT utilized Grant Thornton to audit its own financial statements. Plaintiff's Response to Defendant's Second Request For Admissions, Response No. 19. (Appendix Ex. C).

85. Jack Salmon, Taberna's (and RAIT's) CFO and an experienced auditor, received

and reviewed the audit of FMFC's financials from Grant Thornton, who he believes to be a nationally recognized and reputable auditor. Salmon I Depo. at 70-72 (Appendix Ex. A). He raised no issues regarding the calculation of equity, and any other questions he raised regarding the financials were answered by Taberna Securities' employees. Salmon II Depo. at 33, 36-38, 43-45, 50 (Appendix Ex. B )

### FMCI's Bankruptcy

86. In the second half of 2007, there was an unprecedented disruption in the credit markets, abrupt and significant devaluations of assets directly or indirectly linked to the U.S. real estate finance markets, and the attendant removal of liquidity, both long and short term, from the capital markets. RAIT 2007 10-K at pp.60-62 (Ex. GG). Taberna and RAIT have issued no TPS financing or mortgage backed securities since August 2007. Plaintiff's Response to Defendant's Second Request For Admissions, Response No 59. (Appendix Ex. C).

87. FMCI filed for Chapter 11 bankruptcy protection on February 15, 2008, following an unprecedented collapse of the secondary mortgage market, and the August 21, 2007 bankruptcy of FMCI's wholly owned operating subsidiary, mortgage lender First Magnus Financial Corporation ("FMFC"). FMCI First Amended Bankruptcy Disclosure Statement at 19-25 (Appendix Ex. II); Jaggi Declaration dated August 21, 2007 at ¶¶ 18-19 (Appendix Ex. JJ).

88. FMCI's default on its obligations arising from the TPS Transaction resulted from the collapse of FMFC, and FMFC's and FMCI's subsequent bankruptcies. Jaggi Decl. at ¶ 16.

89. HUD has never revoked or initiated proceedings to revoke any license or authorization of FMFC or FMCI. It has taken no action that interfered with FMFC's or FMCI's business operations or contributed in any fashion to the entities' bankruptcies or FMCI's default on its obligations relating to the TPS Transaction. Jaggi Decl. at ¶ 16.

### Taberna's Claimed Damages

90. Taberna Capital is the collateral manager of Taberna Preferred Funding VIII and, as such, asserts standing to bring this lawsuit on behalf of the beneficial holder. Licht Decl. ¶ 3 (Appendix Ex. R); Salmon Depo. II at 72 (Appendix Ex. B).

91. Taberna Capital's only alleged damages stem from its inability to collect management fees due to FMCI's default on the Note. Salmon II Depo. at 119-120 (Appendix Ex. B).

Dated: New York, New York
       October 22, 2010

                                                                KANE KESSLER, P.C.

                                                                By: _____
                                                                   S. Reid Kahn (SK-1458)
                                                                   Dana Susman (DS-5436)
                                                                   Gerard Schiano-Strain (GSS-8021)
                                                                   Sarah Bawany Yousuf (SY-0305)
                                                                Attorneys for Defendant
                                                                1350 Avenue of the Americas
                                                                New York, New York 10019
                                                                (212) 541-6222

Of Counsel:

Gary Todd Jackson, Esq.
Lane Davis Oden, Esq.
Michael Joseph Butler, Esq.
**BUTLER, ODEN & JACKSON PC**
145 South 6th Avenue
Tucson, Arizona 85701
(520)-884-0024

Thomas Andrew Zlaket
**THOMAS A. ZLAKET PLLC**
310 South Williams Blvd.
Suite 170
Tucson, AZ 85711
(520) 750-0250