UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

TABERNA CAPITAL MANAGEMENT,                    :          No. 08 Civ. 11355 (DLC)
LLC, and LARRY LATTIG, Litigation Trustee for  :
the First Magnus Litigation Trust, as Successor in :
Interest herein to Taberna Capital Management, :
LLC and The Bank of New York Mellon Trust      :
Company, N.A., in its Capacity as Trustee Under :
The Indenture and Property Trustee for the     :
First Magnus TPS Trust                         :
                                               :
                              Plaintiff,       :
                                               :
          - against -                          :
                                               :
GURPREET S. JAGGI,                             :
                                               :
                              Defendant.       :
------------------------------------------------------------x

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
## TO PRECLUDE PLAINTIFFS' EXPERT TESTIMONY
## AND REPORTS AND FOR SANCTIONS

**KANE KESSLER P.C.**
*Attorneys for Defendant*
1350 Avenue of the Americas
New York, New York  10019
(212) 541-6222

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................*ii*

PRELIMINARY STATEMENT .................................................................... 1

FACTUAL BACKGROUND ......................................................................... 3

ARGUMENT ................................................................................................. 6

**POINT I.**
**MORRISS' NEW OPINIONS ARE UNTIMELY AND WERE**
**WITHHELD IN BAD FAITH** ..................................................................... 7

**POINT II.**
**MORRISS' OPINIONS ARE NOT ADMISSIBLE** ...................................... 8

    **A.**   Morriss' Opinions Lack Reliability ......................................... 8
    **B.**   Morriss' Testimony Should be Excluded as Irrelevant ............ 12
    **C.**   Morriss' Qualifications Are Insufficient ................................. 14

**POINT III.**
**JAGGI SHOULD BE AWARDED SANCTIONS FOR PLAINTIFFS' FAILURE TO**
**TIMELY DISCLOSE KNOWN ERRORS IN MORRISS' ANALYSIS** ............ 15

**CONCLUSION** ......................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amorgianos v. National R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002)..................................................................9, 10

*Berry v. City of Detroit,*
    25 F.3d 1342 (6th Cir. 1994) ...................................................................14

*Broadcort Capital Corp. v. Summa Medical Corp.,*
    972 F.2d 1183 (10th Cir. 1992) ................................................................14

*Cooper v. Smith & Nephew, Inc.,*
    259 F.3d 194 (4th Cir. 2001) .....................................................................8

*Daubert v. Merrell Row Pharmaceuticals,*
    509 U.S. 579 (1993)......................................................................... passim

*General Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)...................................................................................8

*In re Acceptance Ins. Cos. Securities Litig.,*
    352 F.Supp.2d 940 (D. Neb. 2004)............................................................8

*In re Nellson Nutraceutical, Inc.,*
    356 B.R. 364 (D.Del. 2006)..................................................................9, 11

*In re Williams Securities Litig.,*
    496 F.Supp.2d 1195 (N.D.Okla. 2007)................................................14, 15

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999).............................................................................9, 14

*Lippe v. Bairnco Corp.,*
    288 B.R. 678 (S.D.N.Y. 2003)..................................................................12

*Liriano v. Hobart Corp.,*
    949 F.Supp. 171 (S.D.N.Y.1996) ...............................................................9

*Nimely v. City of New York,*
    414 F.3d 381 (2d Cir. 2005).......................................................................8

*Ralston v. Smith & Nephew Richards, Inc.*
    275 F.3d 965 (10th Cir. 2001) ..................................................................14

*ii*

*Raskin v. Wyatt Co.,*
    125 F.3d 55 (2d Cir.1997)..........................................................................8, 9

*SEC v. Lipson,*
    46 F.Supp.2d 758 (N.D.Ill.1998) ...............................................................9

*United States v. Duncan,*
    42 F.3d 97, 101 (2d Cir.1994).....................................................................12

*United States v. Jakobetz,*
    955 F.2d 786 (2d Cir.1992).........................................................................12

*United States v. Tin Yat Chin,*
    371 F.3d 31 (2d Cir.2004)........................................................................9, 14

**RULES**

F.R.C.P. Rule 26 ..............................................................................................15

F.R.C.P. Rule 37 ...................................................................................1, 15, 16

F.R.C.P. Rule 56 ................................................................................................1

F.R.E. Rule 403 ......................................................................................1, 12, 13

F.R.E. Rule 702.............................................................................1, 6, 8, 9, 10

## PRELIMINARY STATEMENT

Defendant, Gurpreet Jaggi ("Jaggi") submits this Memorandum of Law in support of his motion, pursuant to F.R.E. 403 and 702 and F.R.C.P. 37(c) and 56(e), to preclude Plaintiffs Taberna Capital Management LLC and Larry Lattig's expert, Lawrence Morriss ("Morriss"), to strike from the summary judgment record the original July 30, 2010 expert reports and November 4, 2010 revised expert report of Morris, and for sanctions against Plaintiffs for their untimely disclosure of known errors and alterations in the Morriss opinions.

At his November 11, 2010 deposition, Morriss acknowledged making a nearly billion-dollar error in his July 30 reports.  Specifically, he acknowledged that the EBITDA calculation supporting his opinion that First Magnus had negative net equity of $299.1 million failed to account for $98.4 million in interest.[1]   The same analysis with the corrected EBITDA results in *positive* net equity of $674.1 million.  With the correct EBITDA, Morriss' report supports Defendant's rather than Plaintiffs' position, in this case and in the adversary action that Plaintiff Lattig is pursuing against Defendant and others in Arizona.

Worse, Morriss told Plaintiffs' counsel of this error in late August, who said nothing of it to Defendant then or prior to Morriss' deposition.  Instead, Morriss and his associates set about preparing entirely new analyses, while Defendant incurred hundreds of thousands of dollars in professional fees to review and rebut the erroneous analyses in the first report, including the discovery and reporting of Morriss' highly material error.

---

[1] "EBITDA" refers to earnings before interest, taxes, depreciation and amortization, and is the starting point for recognized valuation methodologies.  To arrive at EBITDA, the following sums are added to the company's net income: (i) interest charges, (ii) charges against income for all federal, state and local taxes, (iii) depreciation expense, and (iv) and amortization expense.  Morriss properly added back interest expense for his guideline companies but forgot to add it back in his EBITDA calculation for FMFC.

Morriss issued a purported "supplemental" report with new opinions on November 4, 2010, a week before his deposition. His new opinions attempt to salvage Plaintiffs' claims by using the corrected EBITDA amount, but avoid the result that amount generates under his initial methodology, with new analyses and radical changes to the other components of his asset valuation. Specifically, to return to the negative equity that Plaintiff Lattig needs to sustain his insolvency claims, Morriss performed an entirely new reserve analysis, which increased his reserve reduction from $50 million to $127 million. That 250% increase still would not get him to insolvency with the proper EBITDA. So he also abandoned his prior guideline company analysis and the multiplier of 15.31 that he calculated from it, and formulated a new analysis which reduced it over threefold, to 4.12. He now intends to offer his new analyses, and abandon his old ones, to opine that First Magnus had a net equity of negative $594.9 million, a swing of nearly $1.3 billion from his first opinion with the error corrected.[2] He unabashedly stated that he rejects the corrected results of his first analysis because it showed assets worth more than $500 million, and would reject the result of any accepted method which demonstrates that First Magnus was solvent.

As detailed below, Morriss' new, patently biased, and result-driven opinions are untimely and inadmissible, and have no place in these proceedings. His reports submitted to oppose summary judgment should be stricken, and Defendant should be awarded sanctions for being forced to rebut an expert report known to be erroneous, all while Plaintiffs were already in the process of preparing a revision of its fundamental analyses.

---

[2] Specifically, his initial analysis, with the corrected EBITDA, results in a net equity calculation of $674.1 million. His revised opinion of negative $594.9 million is a reduction of $1,269 million from that amount.

## FACTUAL BACKGROUND

Plaintiff Larry Lattig ("Lattig") is an employee of Mesirow Financial Consulting ("Mesirow"), and the contractual litigation trustee for the First Magnus Financial Corporation ("FMFC") estate.  Lattig hired Morriss, a CPA and also an employee of Mesirow, to testify as a paid expert in this matter and in the adversary action Lattig is pursuing in Arizona against Defendant Jaggi and others. *See, e.g.,* Morriss at 5, 366-68.[3]

On July 30, 2010, after reviewing over 25,000 documents, and  billing to the FMFC estate over $3.4 million for over 8,500 hours of analysis, Morriss issued his 161 page report, setting forth his opinions on the financial condition of FMFC prior to its bankruptcy (the "7/30 Arizona Report").  The report concluded that FMFC was insolvent as of June 30, 2006 with a net equity of negative $299.1 million.  Morriss at 16-17; 7/30 Arizona Report at 130-144.

Morriss issued a report in this case on the same date (the "7/30 New York Report"), which incorporated the 7/30 Arizona Report, and restated the same equity and insolvency conclusions, based on same analysis, to support Plaintiffs' claim here that the net equity of $201.1 million stated in the Taberna Questionnaire Response was false.  Morriss at 18, 338-39, 347-49; 7/30 New York Report at 3, 5, 7,14-16.

The components of Morriss' equity analysis for both cases are set forth on page 141 of his 7/30 Arizona Report  (attached as exhibit A).  Morriss at 26, 338-39.  Morriss calculated equity by first valuing FMCI's assets with the "market approach", which he selected and determined to be the most appropriate and reliable of three standard valuation methods.  Morriss

---

[3] Citations to the Morriss Deposition are stated as "Morriss at __ " and relevant pages are attached hereto as Exhibit B to the accompanying November 24, 2010 Declaration of Todd Jackson ("Jackson Decl."). The 7/30 New York and Arizona Morriss reports are annexed as Exhibits B-1 and B-2 to Plaintiffs' Appendix of Exhibits submitted with the opposition to Jaggi's motion for summary judgment. The 11/4 Morriss Report is annexed as Exhibit B-4 to Plaintiffs' Appendix of Exhibits submitted with the opposition.

334704.1

at 29-31, 40; 7/30 Arizona Report at 131-32.   Morriss calculated FMFC's EBITDA to be $88.1 million, which he then reduced by $50 million for an "additional reserve needed" based on the report's lengthy analysis of the loan risks and market conditions.   *See* Jackson Decl. *at Exhibit A;* 7/30 Arizona Report at 130.   He then applied a multiplier of 15.31, determined from guideline companies he selected, to the adjusted EBITDA.   Morriss at 30; 7/30 Arizona Report at 137-140.   The value of FMFC's assets, according to his analysis, was $528.8 million, which results in equity of negative $299.1 million. 7/30 Arizona Report at 140-144.

On August 20, 2010, Defendant sought a 60 day extension to his expert deadline in the scheduling order, in order to review and respond to Morriss' lengthy reports and tens of thousands of FMFC documents he produced with it.   Plaintiff successfully opposed that extension.

Defendant's experts reviewed and timely responded to the Morriss report, at considerable cost.  Among other flaws, they discovered that Morriss had miscalculated FMFC's EBITDA by failing to account for $98.4 million in interest.  They also incurred substantial fees addressing Morriss' reserve and multiplier analyses and the underpinnings for the same.  They completed and issued their reports with these and other findings on September 10, 2010 in Arizona and September 17, 2010 in this case.

At his deposition on November 11, 2010, Morriss conceded the EBITDA error (and others).  Morriss at 18, 49.  He admitted that his original methodology was standard, and that all *other* aspects of the equity calculation in his first analysis were accurate and sound.   Morriss at 26-29; 40-41.   He admitted that, if the proper EBITDA amount had been used in that same analysis, the resulting equity would be $674.1 million, not negative $299.1 million.  *See* Morriss at 49-52; Ex. A to Jackson Decl.   In other words, Morriss' own analysis, with its error corrected,

shows equity that is higher, not lower, than the amount FMFC reported in the Taberna

Questionnaire Response, and plainly defeats Lattig's claim of insolvency.

Morriss claims to have discovered the error himself, not from Defendant's rebuttal report.

He testified that he did so, and reported it to Plaintiffs' counsel, in late August. Morriss at 139-

40, 147. Plaintiffs said nothing to the Defendant, whose experts were working to rebut Morriss'

lengthy analyses at considerable expense.

Morriss prepared a new analysis, which Plaintiffs disclosed as a purported "supplemental

and rebuttal" report on November 4, 2010. In it, Morriss uses the proper EBITDA amount,

which he admittedly overlooked in the 7/30 Arizona Report. Rather than acknowledge its

impact under his first analysis (or even that the first EBITDA calculation was erroneous), his

new report instead abandoned and redid his prior reserve and valuation analyses to achieve

results that return the resulting equity to negative.

Specifically, Morriss reconstructed his reserve analyses, so as to increase the reserve

reduction from $50 million to $127 million. The first report opined that $87 million in additional

reserves (which normalized to a $50 million reduction to EBITDA) should have been booked by

FMFC. This conclusion was based on his lengthy analysis of loan risks, a supposed housing

"bust" in late 2005, and his conclusion that a "risk premium" reserve was necessary as a result,

which he calculated by equating loan repurchase claims filed in the bankruptcy to "actual" future

losses on loans. Morriss at 73-85.

For his second report, Morriss abandoned that methodology and its results, and adopted a

new method based on benchmarking of foreclosure rates. Morriss at 59-61, 72-73, 80-81. The

new opinion used no new information, but rather public information available to Morriss

throughout the entire period of his retention in this case. Morriss at 60. Morriss used this new

5

analysis to increase his reserve reduction to EBITDA from $50 million to $127 million (the normalized amount of the $144.9 million in reserves he now says FMFC should have booked). Morriss at 40-42.

Morriss' new report also changed his multiplier from 15.31 to 4.21. His first report relied upon guideline companies he selected, which his report stated was the proper method under the market approach that he deemed most appropriate. 7/30 Arizona Report at 137-140. That analysis yielded a multiplier of 15.31 (which with the proper EBITDA, shows positive equity under both his first and his increased second reserve calculation).   For his second report, Morriss abandoned the guideline company analysis and its results, abandoned the multiplier he himself had calculated, and instead uses Defendant's expert's income analysis to derive an "implied" multiple for Morriss' revised market approach. Morriss at 42-43, 46-47.   His new multiplier of 4.12 is less then one third of his original calculation, which reduces the resulting asset value of the calculation by a corresponding factor.

After fixing his mistake but applying his new analyses and three fold adjustments of reserves and multipliers, Morriss concludes that FMFC's 6/30/06 net equity is now negative $594.9 million, i.e., almost $1.3 billion less than the net equity that would have resulted had he simply corrected the EBITDA error in what he testified was otherwise a sound analysis in all other respects.

## ARGUMENT

As set forth below, Morriss' machinations are exactly the type of results-driven junk science that Rule 702 and the requirements of *Daubert v. Merrell Row Pharmaceuticals*, 509 U.S. 579 (1993) were designed to preclude.  His new report and its new analyses are also

untimely and were withheld in bad faith while Defendant incurred substantial and unnecessary

expenses to respond to the first report, and should be excluded on such grounds alone.

## POINT I.

### MORRISS' NEW OPINIONS ARE UNTIMELY AND WERE WITHHELD IN BAD FAITH

The Court's deadline for Plaintiffs' expert disclosure was August 2, 2010, as set forth in

its April 9, 2010 Scheduling Order.   Morriss' new report was issued November 4, 2010.   When

Defendant sought an extension of its expert disclosure deadline in the Order, Plaintiffs

vehemently and successfully opposed it.

Plaintiffs knew of the error in Morriss' first report in late August, and said nothing for

two months while Defendant incurred hundreds of thousands in professional fees reviewing and

preparing a response, while Morriss set about constructing a fix by abandoning his disclosed

analyses and formulating new ones.   Jaggi was left to discover the error in Morriss' calculations

on his own, raising a serious question of whether the error would have ever come to light at all,

had Jaggi's experts not discovered it.

Morriss' new opinions are not remotely supplements, "updates," or rebuttal.   Rather, he

prepared entirely new analyses to "cure" the results of the prior analysis that, with its error

corrected, defeated Lattig's claims.   He abandoned his extensive prior reserve analysis, and

formulated and adopted a new one.   He abandoned his extensive guideline company multiplier

analysis, and formulated an entirely new "implied" multiplier valuation theory.   None of these

revisions were based on new facts, documents, data, or testimony.   The materiality of the

alterations on these fundamental variables – which modify the resulting equity and asset value by

almost $1.3 billion – speaks for itself.

The Court's deadlines should be enforced.  The second report should be stricken, and Morriss precluded from offering any of the analyses or opinions reflected in the same.

## POINT II.

## MORRISS' OPINIONS ARE NOT ADMISSIBLE

Before admitting expert testimony, the trial court must determine: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact (sometimes referred to as "fit" and relevance).  *Nimely v. City of New York,* 414 F.3d 381, 396-97 (2d Cir. 2005).  The proponent of expert testimony bears the burden of establishing its admissibility. *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194 (4th Cir. 2001).  These requirements apply at trial and when a plaintiff offers expert testimony in opposition to a summary judgment motion. *Raskin v. Wyatt Co.,* 125 F.3d 55, 65-67 (2d Cir.1997)("the court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment."); *In re Acceptance Ins. Cos. Securities Litig.,* 352 F.Supp.2d 940, 948 (D. Neb. 2004)(striking plaintiffs' accounting expert affidavits from summary judgment opposition).

The most obvious flaw in Morriss' opinions – both old and new -- is reliability.  His opinions also fail to meet the relevance requirement and he lacks qualifications for most of the opinions he seeks to offer.   Each of these deficiencies is addressed in turn below.

### A.    Morriss' Opinions Lack Reliability

FRE 702 requires that an expert's testimony be "the product of reliable principles and methods", and that the expert apply those principles and methods "reliably to the facts of the case."  Opinions "connected to existing data only by the *ipse dixit* of the expert" should be rejected.  *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).  An expert's reliance upon

subjective methodology, unsupported suppositions, or faulty or generalized assumptions, or failure to account for other explanations of data, is grounds for exclusion. *United States v. Tin Yat Chin,* 371 F.3d 31, 40-41 (2d Cir.2004); *Amorgianos, supra,* 303 F.3d at 269; *Raskin,* 125 F.3d at 68. Accordingly, each step of the expert's analysis should be scrutinized, and any step that renders the analysis unreliable renders the expert's testimony inadmissible. *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002).

The methodological soundness of the expert's study is of primary importance. *Liriano v. Hobart Corp.,* 949 F.Supp. 171, 177 (S.D.N.Y.1996). Where the expert's work is not rooted in accepted principles and methodology of the relevant field, it should be rejected. *SEC v. Lipson,* 46 F.Supp.2d 758, 764 (N.D.Ill.1998); *In re Nellson Nutraceutical, Inc.,* 356 B.R. 364, 374-76 (D.Del. 2006)(excluding expert's self-invented variant on standard EBITDA-based valuations methods). Other factors of reliability include whether the theory or method has been subjected to peer review and publication; whether the theories are developed solely for the purpose of testifying rather than work independent of litigation; and whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting. *Rule 702 Advisory Comm. Notes to 2002 Amendments; Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 593-94 (1993).

Morriss' opinions fail these criteria across the board. The July 30 reports are admittedly flawed, and Morriss himself has abandoned the methods, conclusions, and analyses contained in them. He has admitted a $900 million error in the equity calculation in the Arizona report, admitted that the opinions in the New York report are based on it, and admitted that the calculation of equity with the correct EBITDA results in solvency and a net equity in excess of, not less than, that reported to Taberna in the Questionnaire Response. Plaintiffs cannot, and

apparently do not, contend that Morriss' opinions, analyses and conclusions in the first report suggesting to the contrary would be admissible.

Morriss' second report is even worse, and should not be admitted even if Plaintiff were otherwise permitted a do-over in violation of the court's scheduling order.    Morriss' abandonment of methods and analyses he previously adopted and represented to be sound, and rejection of his own analyses to achieve a predetermined result, epitomizes the type of subjective "say whatever is necessary" testimony that *Daubert* and Rule 702 are designed to eliminate. Morriss selected analyses and methods in his first report that he represented to the parties and court to be legitimate and reliable.    He billed a bankruptcy estate for which his client is a fiduciary $3.4 million for that work, which spanned two years and 8,500 hours of analysis.    He has testified under oath that only one component in his analysis was erroneous, and that every other component of the analysis was fair, sound, and accurate.

His effort to now abandon his own methods, and recalculate the other previously sound components, just because the result they yield undermines Lattig's claims, is unreliable and disingenuous on its face.    Under F.R.E. 702, Morriss is required to reliably apply accepted principles to the facts of the case.    Instead, he has done the exact opposite, and rejected what he himself stated were accepted principles, *because* of the result they yield when properly applied to the facts.    Where an expert himself acknowledges a proper methodology but declines to follow that methodology, exclusion is appropriate.    *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 268 (2d Cir. 2002).

Though further analysis should not be required, the other *Daubert* factors and other flaws in both reports further mandate exclusion.    As Morriss himself states in his first report, the market approach to valuation uses a multiplier derived from guideline companies.    In his second

10

report, Morriss used the market approach, but then ignored the multiplier he derived from his guideline companies. His new, self-invented method -- a market approach multiplier "implied" from Defendant's expert's income analysis -- finds no support in Morriss' own description of the market valuation method or anywhere else. His opinion based on it is thus inadmissible. *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 374-76 (D.Del. 2006)(excluding expert's self-invented variant on standard valuation methods).

Indeed, Morriss testified that he would reject any standard valuation method that results in a value of FMFC's assets of more than $500 million, simply because he believes any such result would be "irrational". *Morriss at 34-37*. When asked to provide the most authoritative source for such an approach to valuation, he conceded "there is none".

His reserve calculations were likewise self-invented for this litigation and grossly deficient in rigor and reliability. His first report opined that FMFC should have increased its reserves by $87 million. $48 million of this alleged reserve shortfall is a "risk premium reserve", which he purportedly calculated as 50% of actual losses that occurred in the future, after the bankruptcy. Morriss at 73, 75-76, 81-82, 89. He conceded this approach is not provided for in GAAP, *Morriss at 82*, and that his calculation of "actual losses" was in reality a total of all loan repurchase claims filed in the bankruptcy, without regard to the merits or outcome of such claims, or whether any losses in fact arose at all on the loans subject to them, let alone the amount. Morriss at 76-77, 79-80, 83-85.

After he corrected the EBITDA, he abandoned this approach, deciding "in retrospect" that the result was "too low", and formulated a new foreclosure rate benchmarking analysis to achieve a new $144 million missing loan loss reserve. Morriss at 59, 72-73, 80-81. He admitted that he has never used such a foreclosure benchmarking analysis to calculate loss reserves, that

"there isn't going to be anything exactly like that in any piece of literature," and that he has

never published it, testified to it, or used it in his own work.  Morriss at 61, 69.

Lastly, Morriss has admitted to the erroneous double counting of certain damages

asserted in his original report for his client's avoidance claims, which resulted in an over $5

million overstatement.  Morriss at 19; *see also* Ex. C. to Jackson Decl (7/30 Arizona Report Tab

19 and correction thereof, attached to 11/4 Report).  While not directly at issue here, it is further

evidence that "intellectual rigor" and reliability is seriously lacking in Morriss' outcome driven

work in this dispute.

**B.      Morriss' Testimony Should be Excluded as Irrelevant**

Expert testimony is only relevant where it is helpful to the jury and adds relevant

expertise to the issues in dispute.   It is not relevant "if the expert is offering a personal

evaluation of the testimony and credibility of others or the motivations of the parties." *Lippe v.*

*Bairnco Corp.,* 288 B.R. 678, 687 (S.D.N.Y. 2003).   An expert may not merely reiterate

arguments based on inferences that can be drawn by laypersons or advance what the parties can

argue in their summations, nor may it consist of conclusions that "attempts to substitute the

expert's judgment for the jury's." *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994).  An

expert must do more than "propound a particular interpretation [of a party's] conduct."

The court should also determine whether the probative value of the proffered evidence

substantially outweighs its danger of unfair prejudice. *United States v. Jakobetz,* 955 F.2d 786,

794 (2d Cir.1992).  Because "expert evidence can be both powerful and quite misleading," the

court, in weighing possible prejudice against probative force under Rule 403, "exercises more

control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595.

Here, Morriss intends to offer opinions "from a forensic accounting perspective" that certain regulatory matters were not disclosed to Taberna and were misrepresented in the responses to the questionnaire. 7/30 New York Report at 17-21. As Morriss testified, this means he is "really just taking a look at the issues and being able to compare them to determine whether or not something is, from a forensic perspective, from an evidentiary perspective, representative of the whole." Morris at 304-05. He acknowledges that his purportedly superior skill at investigating and reporting on facts is the sole expertise he offers to the case on such issues. Morris 328-31. His report (at pages 17-21) further confirms that he is simply restating Plaintiffs' version of the evidence about what was and was not disclosed to Taberna.

Such "expertise" is not relevant, and such opinions are not proper expert testimony in any case. Morriss' opinions consititute advocacy, not expertise, and are of no assistance to the Court or jury. Moreover, Morriss' reports and testimony are particularly prejudicial here, as Morris did not speak to any of the pertinent regulatory auditors (Morriss at 116, 304), did not review Taberna's due diligence file, did not speak to any of Taberna's personnel or attorneys involved in the transaction, and did not know what they did or did not review. Morris at 88, 289, 301-02.

In short, Morriss' proposed testimony is nothing but an effort by Plaintiffs to offer their arguments from the witness stand, avoid the hearsay rule, and prove through a paid "expert" what they cannot prove through fact witnesses who actually did the negotiations and due diligence and could testify first-hand about what material information was or was not disclosed to them. As such, it fails to meet the requirements for expert testimony, and is also inadmissible under F.R.E. 403.

Lastly, Morriss has also stated his opinion that FMFC breached its agreements with warehouse lenders and takeout investors by failing to disclose regulatory investigations to them

13

(again without talking to any of them).  Morris 363-64.  Such issues are irrelevant and collateral to the Taberna claims in this case.  Even if the issues were themselves relevant and Morriss had the expertise to opine on them, his opinions purport to tell the jury how to rule on a legal issue. They are thus are inadmissible under the above standards.

### C.    Morriss' Qualifications Are Insufficient

The court must decide whether the proffered expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case."  *Kumho Tire Co.,* 526 U.S. 137, 156-57 (1999).  The court should compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony. *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir.2004).  In other words, the issue is not the witnesses' qualifications in the abstract, "but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Ralston v. Smith & Nephew Richards, Inc.* 275 F.3d 965, 967-70 (10th Cir. 2001)(physician's general credentials insufficient where proposed testimony did not fit within her specific expertise); *Broadcort Capital Corp. v. Summa Medical Corp.,* 972 F.2d 1183, 1194-95 (10th Cir. 1992)("some education and training" in the field of securities law did not qualify attorney as expert in the area); *In re Williams Securities Litig.*, 496 F.Supp.2d 1195, 1244 (N.D.Okla. 2007)(rejecting expert with general qualifications to perform valuations but lacking "the industry specific expertise necessary to make the numerous judgments" required for the company at issue).

Morriss is an accountant.  He has no experience conducting due diligence for a commercial loan, and no experience or expertise with respect to trust preferred securities beyond "knowing what they are."  Morris at 315, 330.  While he may have the qualifications to perform

financial audits or accounting tasks, his skill in reporting on the evidence is all he purports to offer on the issues relating to regulatory matters, and this does not qualify him as expert.

He also lacks any legal training or expertise, Morriss at 352-53, and thus has no qualifications to interpret and offer his proposed opinion that FMFC was in default under its agreements with warehouse lenders and takeout investors.

Lastly, he lacks any "industry specific" expertise or experience to make the numerous judgments required for his proffered evaluation of loan loss reserves that he says "should have been" maintained at FMFC in 2006. His first "risk premium" theory and "future loss" calculation, as well as his attempted extrapolation of a loan loss reserves for a warehouse-based mortgage bank from overall foreclosure rates, are based on extensive and elaborate assumptions regarding the mortgage business, the economics of housing markets, and relative risks of mortgage loan products and underwriting criteria, all topics on which he brings no credentials or experience whatsoever. He has never worked at a mortgage bank or any other financial institution. Morriss at 118-19. He has never been involved in setting underwriting standards for loans and, other than auditing file documentation, has never had any involvement in evaluating credit risk on loans. *Id.* Morriss thus fails to meet the qualifications element of the *Daubert* analysis for these issues and should be precluded from addressing them on this basis also.

## POINT III.

## JAGGI SHOULD BE AWARDED SANCTIONS FOR PLAINTIFFS' FAILURE TO TIMELY DISCLOSE KNOWN ERRORS IN MORRISS' ANALYSIS

F.R.C.P. Rule 26 (e) requires a party to supplement his prior disclosures "in a timely manner if the party learns that in some material respect the disclosure is incomplete or incorrect...." If a party fails to do so, F.R.C.P. Rule 37 (c)(1) allows the Court to enter the

15

sanctions set forth therein and in F.R.C.P. Rule 37(b)(2), including the dismissal of claims, precluding witnesses and evidence, and awarding expenses incurred as a result of the failure to disclose.

Here, Defendant incurred hundreds of thousands in professional fees preparing a defense and rebuttal to lengthy expert analyses in Morriss' initial reports, which Plaintiffs and Morriss both knew were flawed, and for which they were in the process of a fundamental revision, neither of which they revealed.  In addition, Plaintiffs have submitted the admittedly flawed report, and the untimely revised report to support their opposition to summary judgment on all aspects of their claims, and as the *only* factual support for their claims premised on FMFC's equity, reserves, and solvency.

Because Plaintiffs submitted an admittedly flawed expert report and failed to timely disclose known errors in the report, Jaggi respectfully requests that any of Plaintiffs' claims based on the Morris analyses be dismissed as a sanction under Rule 37 or alternatively, that Morriss be excluded as a witness and his reports stricken for the summary judgment record on this ground (i.e., in addition to the *Daubert* grounds described above).  In either event, Jaggi also requests that Plaintiffs be ordered to reimburse the professional fees incurred by Jaggi in preparing a response to Morriss' initial reports.

## CONCLUSION

For the foregoing reasons and principles of law, Jaggi respectfully requests that the Court preclude Morriss' testimony at trial and strike Morriss' reports from the record on Jaggi's October 22, 2010 Motion for Summary Judgment, sanction Plaintiffs for their untimely disclosure of errors in Morriss expert report by dismissing all claims that rely on the report and ordering Plaintiffs to reimburse Jaggi for all professional fees incurred in responding to the

334704.1

erroneous report and grant such other, further and different relief as to the Court may seem just and proper.

Dated: New York, New York
         November 24, 2010

                                        KANE KESSLER, P.C.

                                        By:_____
                                           S. Reid Kahn (SK-1458)
                                           Dana Susman (DS-5436)
                                           Gerard Schiano-Strain (GSS-8021)
                                           Sarah Bawany Yousuf (SY-0305)
                                        *Attorneys for Defendant*
                                        1350 Avenue of the Americas
                                        New York, New York 10019
                                        (212) 541-6222

Of Counsel:

Gary Todd Jackson, Esq.
Lane Davis Oden, Esq.
Michael Joseph Butler, Esq.
**BUTLER, ODEN & JACKSON PC**
145 South 6th Avenue
Tucson, Arizona 85701
(520)-884-0024

Thomas Andrew Zlacket
**THOMAS A. ZLACKET, PLLC**
310 South Williams Blvd.
Suite 170
Tucson, AZ 85711
(520) 750-0250

17

334704.1